In the Matter of the Accounting of MATILDA H. LLOYD et al., as Trustees under the Will of FRANCIS G. LLOYD, Deceased.

MATILDA H. LLOYD et al., as Trustees, et al., Appellants; JOAN H. LLOYD et al., Respondents.

Argued February 21, 1944; decided April 13, 1944.

*Raymond M. White, Forrest M. Anderson* and *Kenneth R. Strickland* for appellants. The will directs that all dividends be treated as income regardless of the effect thereof upon principal. (*Matter of Osborne,* 209 N. Y. 450; *United States Trust Co.* v. *Heye,* 224 N. Y. 242; *Equitable Trust Co.* v. *Prentice,* 250 N. Y. 1; *Baker* v. *Thompson,* 181 App. Div. 469, 224 N. Y. 592; *Lowry* v. *Farmers' Loan & Trust Co.,* 172 N. Y. 137; *Robertson* v. *de Brulatour,* 188 N. Y. 301; *Matter of Mart,* 139 Misc. 558; *Matter of Rowland,* 273 N. Y. 100; *Matter of Enz,* 204 App. Div. 634, 237 N. Y. 577; *McLouth* v. *Hunt,* 154 N. Y. 179; *Matter of Pennock,* 285 N. Y. 475; *Matter of Rogers,* 22 App. Div. 428, 161 N. Y. 108.)

*Horace N. Taylor, George Levitus* and *Eugene B. Thurston* for Evelyn W. Miller, as trustee, and another, *amici curiæ,* in support of position of appellant.

*Thomas I. Sheridan,* as special guardian for Joan H. Lloyd and others, infants, respondents. The payments of so-called dividends made by the trustees to the life beneficiaries were improper under the circumstances. (*Bourne* v. *Bourne,* 240 N. Y. 172; *Matter of Osborne,* 209 N. Y. 450.)

DESMOND, J. By the decree appealed from, these accounting testamentary trustees have been held subject to surcharges because they allocated wholly to income certain 1932 and 1936 cash dividends on corporate stock held in two of the three trusts erected in obedience to the commands of the will. The will named the widow and appellant trust company as executors and trustees, bequeathed a sum of money to the widow, gave the widow the life use of two residences, devised a country

estate to testator's only daughter and then directed that the whole of the residue be divided into three separate trusts. Into the first trust went twelve sixteenths of the residue, with income to the widow for life and provisions for disposal of the principal and income after the widow's death, for the benefit of the daughter, the daughter's descendants and a grandson. The second trust is of three sixteenths of the residuary estate with income payable to the daughter and the remainder to pass to her children and grandchildren. The remaining one sixteenth, under the will, formed the corpus of a trust the income of which was to be used for the support and education of the grandson till he should reach the age of twenty-one years, the income thereafter to be paid to him until he should arrive at his thirtieth birthday, whereupon he was to have the principal. (The grandson has reached the age of thirty and has settled with the trustees, so his trust is not in litigation here.) After ordering the setting up of those three trusts, the will made further directions as follows: " *Tenth:* I hereby authorize my Executors and Trustees in their discretion to retain any investment which I may leave at the time of my death as a continuing investment, whether such investment be considered under the Laws of the State of New York a legal trust investment or not, and I further direct my Executors and Trustees to treat all dividends and all rights to subscribe for additional stock as entirely income, regardless of the fact that such dividends and rights may possibly encroach upon the principal of the trusts herein created, and I further direct that the shares of my estate, hereinbefore given to my Trustees, shall embrace income from the same date, viz., from the date of my death." When testator wrote his will in 1918 and when he died in 1920 a large part (valued at several hundred thousand dollars) of his estate consisted of the preferred and common stocks of a corporation of which he had been president for many years. During his life and up to the time of his death that corporation enjoyed large profits and paid regular and substantial dividends. The above quoted language of article Tenth of the will is on its face a most emphatic and urgent command to the trustees that they pay out as income all dividends received by them, even though such payments result in an impairment of the principal values of the trusts. Reading that language, and keeping in mind while we

read it the size of testator's holdings in the corporation to
which we have above referred, and the fact that the income
beneficiaries were his widow, her daughter and his grandson
and the further fact that all his productive property went into
the trusts, we cannot possibly doubt that the testator intended
by article Tenth to issue a mandatory direction that all divi-
dends received by his trustees on the stock of that corporation
be distributed by the trustees to the income beneficiaries, for
their support. However, the courts below, sustaining objec-
tions filed by a special guardian for infant (contingent)
remaindermen, have ruled that a part of the dividends paid
on the preferred stock in 1932 should have been accounted for
as principal, not income, and that the whole of the 1936 pre-
ferred dividends were, similarly, principal and not income, in
the hands of the trustees. (No dividends on common stock
are here in dispute.) The special guardian grounded his objec-
tions, fundamentally, on the fact that when the 1936 dividends
were declared and, similarly, when some of the 1932 dividends
were declared, the corporation had previously exhausted its
surplus but had created, in each year, a new '' book surplus ''
by reducing its capital.

On January 14, 1932, when the corporation's fiscal year
began, it had no surplus but had on hand undivided profits of
about $150,000. During that fiscal year it suffered an operating
loss of about $650,000 and paid out $157,500 in three regular
quarterly preferred dividends. In April of that year, by appro-
priate corporate action, it reduced its capital by $750,000, so
that, starting out with the undivided profit fund and then giving
effect to the dividend payments and the cut in capital, the
corporation ended its fiscal year of 1932 with a net balance
of about $90,000 in its '' capital surplus account ''. No attack
is here made on the legality of the reduction of capital or of
the dividend distributions made possible by that reduction (see
*Jay Ronald Co.* v. *Marshall Mortgage Corp.,* 291 N. Y. 227). The
Surrogate, however, attached great importance to the fact that
the first two quarterly dividends of that year, added to the losses
sustained up to the times of the declaration of those dividends,
had more than used up the credit balance which had been in
the undivided profits account at the year's beginning. Ruling
that any payments to stockholders out of the new surplus

created by the reduction of capital belonged to the capital account of the trusts when received by them, the Surrogate made a calculation which worked out to the result that the second and third 1932 preferred dividends and a part (approximately two thirds) of the first such dividend of that year should have been assigned by the trustees to the capital account, not the income account, of the trusts. So much for 1932.

We consider now the 1936 dividends. No dividends were paid by the corporation during the fiscal years 1933, 1934 and 1935, so that at the beginning of 1936, the accumulated arrears on the preferred stock were over $800,000. Analyzing the corporation's history for its fiscal year 1936, the Surrogate came to the conclusion that a dividend of $2.25 per (preferred) share, paid December 28, 1936, on account of arrears, should not have been turned over by the trustees to those entitled to the income of these trusts. As of the beginning of that year the corporation's capital had been impaired to the extent of about $935,000. In December it reduced its capital by $1,500,000 and was thus able to show on its books a new surplus of $565,000. In 1936, unlike 1932, the business itself was carried on at a profit of $77,000, which operating profit exceeded by about $10,000 the 1936 dividend payment of $67,050. But this dividend, also, the Surrogate ordered treated as principal, not income. Pointing out that the New York statute (Stock Corp. Law, § 58) forbids the payment of dividends except from surplus and that a " created " surplus resulting from a reduction of capital does not change the fact of a prior capital deficit, the court reasoned that the placing in a trust's income account of dividends paid to it after the corporation's capital deficit has been eliminated, not by accumulation of earnings but by bookkeeping entries consequent on capital reduction, operates to reduce the " intact value " of the trust. In other words, according to the Surrogate, the 1936 dividend, so far as these trusts were concerned, should have been treated as capital, since it represented moneys which in the corporation's own hands would necessarily have been used (had not its capital been reduced) to restore part of the prior capital shrinkage. The 1936 dividend, reasoned the Surrogate, was in cold fact a distribution to shareholders of part of the " contributed capital " of the corporation. When such a dividend came into these trusts, he

held, it had to be put into the capital of the trusts, otherwise their original value, lessened by the corporation's losses, would never be restored and income would flourish while capital disappeared. Confronted by the language of the will, the Surrogate wrote: "The words ' all dividends ' as used in this will are to be understood as meaning dividends earned and payable in the normal course of ordinary corporate management. In any case they do not apply to the distribution of the contributed capital of the corporation even though that distribution is denominated a dividend by the directors." On the contrary, we think "all dividends" necessarily include the dividends here under scrutiny.

"If", wrote the Surrogate, "a dividend arising from such procedure is not to be put into capital account of the Trust it is evident that the Trust principal can be appropriated to income completely." But a testator may have it that way if he wishes it. A testamentary trust provision is not invalid merely because it results in the payment to "income beneficiaries" of part of the corpus. (*Matter of Osborne,* 209 N. Y. 450, 474.) The freezing of trust principal, so as to keep its original or "intact" value undiminished, is a matter of choice for the trustor. His expressed choice settles the question. This testator did not leave it to the courts to "look into the facts, circumstances and nature of the transaction and determine the nature of the dividend and the rights of the contending parties according to justice and equity" (*Matter of Osborne, supra,* at p. 475). He did all that for himself. He spared the courts and the Legislature the burden that might otherwise have been theirs (see *Bourne* v. *Bourne,* 240 N. Y. 172; Personal Property Law, § 17-a, *Opperman's Estate (No. 1),* 319 Penn. St., 455), of equitably allocating as between his income beneficiaries and his remaindermen, dividends that for one reason or another might be held to trench on his capital funds. In clear language he instructed his trustees to "treat all dividends" as "entirely income", regardless of encroachments on principal. That command of the testator is the law of these trusts, and the trustees obeyed that command when they turned over the dividends to the income beneficiaries.

The order of the Appellate Division and the decree of the Surrogates' Court, so far as appealed from, should be reversed,

and the matter remitted to the Surrogates' Court for entry of a decree in conformity with this opinion, with costs in all courts to the appellants and respondents, payable out of the estate.

LEHMAN, Ch. J., LOUGHRAN, RIPPEY, LEWIS and CONWAY, JJ., concur; THACHER, J., taking no part.

Order reversed, etc.