Lott H. Wells, S.
The questions of allocation of certain stock received "by the trustee from General Electric Company and Standard Oil Company (Indiana), corporations in which the estate owned shares, and of construction of the will, are presented in connection with the final accounting of the successor trustee for the period from appointment on May 27,1929 through November 21, 1955.
*490 The testator, Carlton E. Sanford died September 2,1915. His will which was executed July 29, 1915 devised his real property and bequeathed $5,000 in cash or securities to his widow, Frances M. Sanford, and set up his residuary estate in trust for her life use. She died on July 24,1955 and the corpus of the trust is now distributable to Alice S. Dewey and Varick E. Sanford, the children of Herbert J. Sanford, brother, who died December 7,1922. Alice Sanford Shepard, decedent’s sister and a contingent beneficiary died in 1924. The Guaranty Trust Company of New York, the accounting trustee, requests the court to determine the nature and character of distribution of said additional shares of stock, and the extent of the rights and interests, if any, of the executor of the will of Frances M. Sanford, deceased income beneficiary of this trust.
In the twelfth provision of his will the testator directed, “ I give and bequeath the income from my said Trust Fund or estate to my wife, Frances M. Sanford for her comfort and support in sickness and in health and direct my said Trustee to pay the same to her from time to time annually as she shall need the same, so long as she remains my widow.
‘ ‘ If my wife shall not need or take the whole of said annual income, I trust she will let the part not taken remain in my Trustee’s hands as an accumulation. If, later, sickness or a trip may require this accumulation, she can of course use such part of it as she may need. Any part of such income or accumulation as shall not be used, I wish on her demise to pass into and become a part of my residuary estate. If, through losses or otherwise, the income from said Trust Estate due to my wife shall fall below Five Thousand ($5,000.00) Dollars in any year, and she shall need and require it, an amount shall be paid to her from the principal of said Trust Estate which, with the income, shall equal or make the annual income to her the sum of Five Thousand ($5,000.00) Dollars.”
In the fourteenth provision the testator indicated his intention was known to his wife, as follows: “ I would make a most generous bequest to my dear sister Alice, one of the noblest of women I have known, but I do not see how she can need it or use it. I do, however, expressly charge my residuary Trust estate with the payment to her of such moneys as she may need annually for her good care and support, above and in addition to her own income * * * I have drawn this instrument while at my desk in the Bank, taking several days for its completion because of the many and constant interruptions. I fear that it is not as smooth and symmetrical a paper as it should be, and possibly inconsistent in some particulars, but I am sure my *491 intent and meaning are clear. I have such unqualified confidence in the candor, fairness and kindliness of my wife, brother and sister, that I well know that all they or either of them will seek to gather or learn will be my intent. My sole purpose has been to do what is fair, just and right, and trust I have.”
The executor of the estate of the widow claims that 7/12 of the new General Electric stock or 175 shares at $50.055466, value $8,759.71, and 56.97 shares of new Standard Oil Company (Indiana) stock at $49.0465, value $2,794.18, should be apportioned to income and be paid to the estate of the widow. He does not raise any question of solvency of her estate and relies on the rule laid down in Matter of Osborne (209 N. Y. 450 [1913]). The court in that case held that as between life beneficiary and remainder-man a stock dividend would be reckoned as principal or income according to the origin of the surplus out of which it was declared. To the extent that it distributed a surplus existing at the creation of the trust, it would be allotted to principal; to the extent that it distributed a surplus earned thereafter, it would be allocated to income (Equitable Trust Co. v. Prentice, 250 N. Y. 1, 7 [1928]). Market value, good will and like considerations cannot be considered in apportioning a dividend (Matter of Osborne, supra, p. 485). Those who share in the corpus contend this apportionment would be contrary to the testator’s intent.
On November 15, 1937 the trustee purchased 15 shares of no par value common stock of the General Electric Company at $41.11533 per share ($616.37) and on April 23, 1941, 85 additional shares of the same stock at $30.3850588 per share ($2,582.73), (total cost $3,199.10).
On April 20,1954 at the annual meeting of the stockholders of that company, the following “ resolution ” was duly adopted: “Resolved: (a) that the 35,000,000 shares of Common Stock without par value which the Company is presently authorized to issue be changed into 105,000,000 shares of Common Stock with a par value of $5 each, on the basis that each such previously authorized share of Common Stock without par value, whether issued or unissued, shall be changed and converted into three shares of Common Stock having a par value of $5 each; ’ ’.
The notice of annual meeting and proxy statement sent to the shareowners of General Electric stated: '‘ The Company at the present time has issued 28,845,927.36 shares of its Common Stock without par value. These shares have a stated value for capital purposes of $6.25 each, resulting in total capital of $180,-287,046. If the action proposed above is taken by the share owners, the Company will have issued 86,537,782.08 shares of *492 stock having a par value of $5 each. This will require the Company to increase its capital from $180,287,046 to $432,688,910.40. Your Board of Directors has accordingly taken the necessary action to provide that such increase will become effective upon the adoption by the share owners of the foregoing resolution, by the transfer of $252,401,864.40 from the Company’s reinvested earnings (earned surplus) which as shown in the Annual Report for 1953 amounted to $729,862,586 at December 31, 1953.”
The effect of the action taken by the General Electric Company as stated in Matter of Fosdick (147 N. Y. S. 2d 509, 512 [1955]) was “ (1) cancellation of all its old stock; (2) increase of the capital of the company to $432,688,910.40; (3) increase of the issued and outstanding stock to 86,537,782.08 shares, each having a par value of $5; (4) replacement of the former issued and outstanding 28,845,927.36 shares of common stock, without par value but of a stated value for capital purposes of $6.25 a share, by the issuance of 36,057,409.2 shares of $5 par value stock for the then existing capital of $180,287.046; (5) issuance in addition of 50,480,372.88 shares of $5 par value stock and capitalizing surplus by transferring surplus to capital in the amount of $252,401,864.40 which represented new capital. Thus 5/12 is the proportion of the new stock which represents the former capital, while the remaining 7/12 of the new stock represents new capital.”
This conversion was effective May 5, 1954. Thereafter and on or about the 16th day of June, 1954 the trustee received notice from General Electric that its certificates representing shares without par value were to be considered as representing an equal number of shares of the par value of $5 each and also received as a result of conversion certificates for an additional 200 shares of common stock of the par value of $5 of said corporation.
On April 23,1941 the trustee purchased 77 shares of the common stock of Standard Oil Company (Indiana) at $27.58065 per share ($2,123.71) and on November 29,1943, 23 additional shares of the same stock at $32.98304 per share ($758.61), (total cost $2,882.32).
On September 23,1954 the board of directors of Standard Oil Company (Indiana) by resolution duly adopted, provided for a cash dividend and “ Further Resolved that a stock dividend of 100% on the capital stock of this company issued and outstanding, including treasury stock be and hereby is declared payable first out of capital surplus and the remainder out of earned surplus, on the 1st day of December 1954 to stockholders of record at the close of business on the 25th day of October 1954; ’ ’.
*493 As stated in the petition (p. 6): “ In order to provide for the additional shares to be distributed as stock dividend to holders of its capital stock of record on October 25, 1954, the Standard Oil Company (Indiana) transferred the sum of $405,746,402.38 to its capital account being $25 for each additional share issued. Of this sum $174,612,824.62 was transferred from capital surplus, being the entire balance in the capital surplus account of the company on that date. The balance of $231,133,577.76 was transferred from earned surplus.”
The effect of the action taken by Standard Oil Company (Indiana) was further stated in Matter of Fosdich (supra, p. 513): ‘1 was the issuance of a stock dividend of new stock and the transferring of $405,746,402.38 to its capital account, being $25 for each additional share issued. The funds transferred from the company’s capital surplus account constituted 43.03% of the entire sum transferred to the capital account and the funds transferred from the company’s earned surplus account constituted 56.97 % of the funds transferred to the company’s capital account.”
The trustee on or about December 1, 1954 received an additional certificate for 100 shares of capital stock of said company.
On October 5, 1955 the original and additional shares of General Electric Company common stock were sold for $15,016.64 and the original and additional shares of Standard Oil Company (Indiana) capital stock were sold for $9,809.30 and represent the market value at that date. The proceeds have been retained in the principal of said trust.
In 1926 the New York Legislature clarified the law of this State by providing (L. 1926, ch. 843; Personal Property Law, § 17-a) that in the absence of a contrary provision in the will or instrument creating a trust all stock dividends upon stock composing the principal of such trust should be principal and not income to the trust; but this law is not retroactive and so does not help us in respect to this trust. (Matter of Strong, 198 Misc. 7, 15 [1950].)
The first amendment of the statute in 1922 (L. 1922, ch. 452) makes provision to the effect that thereafter a founder of a trust may direct that stock dividends be added to principal and that no unlawful accumulation shall result therefrom. The second amendment (L. 1926, ch. 843) prescribes a new presumption as to trusts thereafter founded. For trusts then in being, the presumable intention is to allocate the dividend to the income or more accurately apportion it under the Osborne rule, already stated. For trusts subject to the statute the presumable intention is to add the dividend to principal. In the one case as in the *494 other the presumption may be reversed by the declaration of the founder. (Equitable Trust Co. v. Prentice, 250 N. Y. 1, 13, supra.)
In their typical or common form dividends are income like other recurrent gains. (Equitable Trust Go. v. Prentice, supra, p. 8.) Essentially, however, a dividend constitutes a distribution of earnings, and a stock dividend is made by the issuance and delivery to stockholders of additional stock supported by assets, usually earnings transferred to capital. It amounts to a cash dividend and simultaneous reinvestment thereof with the company by the stockholder, and the stockholder receives additional stock from the company as evidence thereof, A stock split on the other hand, gives the stockholder no additional stock, but merely divides that which he previously held without altering the amount of the capital and surplus of the company. (Matter of Strong, 198 Misc. 7, 19, supra, affd. 277 App. Div. 1157.)
“ Dividend ” and “ stock dividends ” are defined in the New York Tax Law (§ 350, subd. 8) as follows: “ The word ‘ dividend ’ means any distribution made by a corporation out of its earnings or profits to its shareholders or members, whether in cash or in other property or in stock of the corporation, other than stock dividends as herein defined. ‘ Stock dividends ’ means new stock issued for surplus or profits capitalized, to shareholders in proportion to their previous holdings.”
In determining who is entitled to a dividend upon stock held in trust the intention of the testator or the maker of the trust must be carried out when .such intent is clear so far as such intent does not result in an unlawful accumulation of income. (Matter of Osborne, 209 N. Y. 450, 458, supra; Equitable Trust Co. v. Prentice, supra, p. 8; Matter of Lloyd, 292 N. Y. 280, 285.)
The fact that the capital necessary for the additional stock issued came in part from capital surplus account and in part from the earned surplus account does not alter the situation. (Matter of Lawrio, 119 N. Y. S. 2d 906, 912 [1953].)
“ Some things are always income, such as accruing interest or rent. Some are always principal, such as farms or factories . or dwellings, held without change of title as part of an original investment, or even shares of stock so held in the absence of a change of form. Some may be one or the other for this purpose or for that. Stock dividends in the true sense, i.e., dividends capitalizing surplus as distinguished from those payable in the stock of a subsidiary * * * have predominantly the quality of an increment to principal, though at times, in furtherance of intention, they have been classified as income. When a dividend is paid in cash, the ownership of the corporate *495 assets is changed; the company owns less, and the shareholder owns more, or something essentially different, though its value be no greater. Upon the distribution of a stock dividend, ownership of the assets is precisely as it was. ‘ A stock dividend does not distribute property, but simply dilutes the shares as they existed before ’ ” (Equitable Trust Co. v. Prentice, supra, p. 12).
It should be observed that the investment in the General Electric Company stock bought for $3,199.10 and the Standard Oil Company (Indiana) stock bought for $2,882.32 has returned a high rate of interest. In 1944 the trust received $140, cash dividends on the G. E. stock. By 1953 this had increased to an annual rate of $300, and to $400 for 1954. In 1955 the dividend amounted to $480, which included an amount paid on the new stock. In 1944 the cash dividend paid on the Standard Oil of Indiana stock was $150. This increased to $250 in 1953 and 1954. In 1955 the dividend amounted to $280, which included amount paid on the new stock. On June 11, 1954 the last stock market transactions for the old G. E. stock, the shares sold for 115% to 117%. The new stock on June 14, 1954 sold for 39% to 39%. On November 30,1954 the last stock market transaction for the old Standard Oil Company (Indiana) stock, the shares sold for 94 to 94%. The new stock on December 1, 1954 sold for 46% to 47%. The market value (principal) after the new stock "was issued was substantially the same. The sale on October 5, 1955 of the General Electric stock for $15,016.64 and the Standard Oil Company (Indiana) for $9,809.30 represents the natural growth and increase in the corporate plant and business for the period since the new stock was issued.
The principal payments to the widow to raise her annual income to $5,000 as provided by twelfth provision of the will, are shown in schedule (F) of the account. The payments commence with year ending August 17, 1938, on request by the widow, and were made each year thereafter, except 1952, when the income was $6,880.32. The last principal payment, $386.45 was made August 31, 1954 for the year ending August 19, 1954. The principal payments for the period of this accounting total $17,771.78. The income payments schedule (F-l) of the account, August 19, 1929 through July 20, 1955, total $123,357.56. The largest annual payment was $8,301.36 for this period. The trust principal received by the accounting trustee on August 1, 1929 was $164,057.22. The trust principal on hand schedule (H) of account is $153,237.58.
It is a well-settled rule of law that shares received by a trustee as the result of a stock split are in the absence of a *496 direction in the. instrument to the contrary allocable to the principal of the trust. (Matter of Lissberger, 189 Misc. 277 [1947], affd. 273 App. Div. 881; Matter of Strong, 198 Misc. 7 [1950], affd. 277 App. Div. 1157, supra.)
. From the foregoing and the wealth of authoritative decisions cited, it is readily seen that it had been uniformly held that a declaration of dividend such as was made by the General Electric and Standard Oil Companies can only be construed and determined to be a stock dividend. (Matter of Fosdick, supra, p. 518.)
Inasmuch as the decedent died prior to the enactment of section 17-a of the Personal Property Law, and his will contains no provision in respect to the allocation of stock dividends as between principal and income we must determine his “ presumable intention ” by resort to general principles of construction. (Equitable Trust Co. v. Prentice, supra, p. 9.) Obviously as the law stood prior to 1926 a transfer of earned surplus to capital for the purpose of declaring a stock dividend and the declaration and issuance of such stock dividend to a trustee stockholder required the allocation of such stock to a life tenant of the trust within the limits of the Osborne case. (Matter of Strong, supra, p. 15.)
Accordingly, I am of the opinion and find the replacement of the former issued and outstanding 28,845,927.36 shares of G. E. common stock, without par value, but of a stated value for capital purposes of $6.25 a share, by the issuance of 36,057,409.2 shares of $5 par value stock for the then existing capital of $180,287.046 constitutes in effect a stock split, one for four. This resulted in dividing the original 100 shares of old stock into -125 shares of the new stock, without altering the amount of capital and surplus of the company. This limited the General Electric stock dividend to the balance or 175 shares. Of this, 5/12 or 72.92 shares is retained in principal and is the proportion of new stock which represents the former capital. That 7/12 or 102.08 shares, value $5,109.66, is the proportion of new stock which represents the new capital.
' The: Standard Oil of Indiana funds transferred from capital surplus- account constituted 43.03% of the entire sum transferred to the capital .stock account, and the funds transferred from earned surplus account constituted 56.97% of the entire sum so transferred. Therefore, 43.03% . of the. distributed shares -is ■ retained -in principal as - amount capitalized -from surplus capital and is considered in effect a -stock split. The balance -or 56-97'% rof the distributed stock,, value $2,794.18, plus the *497 $5,109.66 from the Gr. B. stock, total $7,903.84, constitute “ stock dividends ” and should be apportioned to income.
If it is held, however, that such income belongs to and is payable to the estate of Frances M. Sanford, the deceased life tenant, the principal payment of $386.45 for year ending August 19, 1954 must be deducted from the $5,109.66 the Gr. E. stock dividend apportioned to income.
With respect to this $7,903.84 now apportioned to income, the question of apportionment between the estate of the life tenant and the remainderman is now presented. The question of whether the extraordinary stock dividends from the General Electric stock received June 16, 1954 and the Standard Oil (Indiana) stock, received December 1, 1954 are apportionable between income and principal or are to be treated as wholly income or principal was not presented by the trustee for determination prior to the death of the life tenant. The trustee took the position upon receipt of the distributions from General Electric Corporation and Standard Oil Company (Indiana) that said distributions constituted stock splits which were allocable to the principal of said trust. Consequently it was not held as income in the brief period between the receipt of the stock and the death of the life tenant. The trustee now holds it subject to this construction proceeding on advice by counsel that such income may belong to and be payable to the estate of Frances M. Sanford, the deceased life tenant. But for this question, it is not disputed that prior to her death there had been paid monthly to the life tenant all the net income actually received by the trustee, although the will directed the “ trustee to pay the same to her from time to time annually It appears that the last monthly payment of income made by the trustee to the life tenant was on July 20, 1955 (schedule F-l of account). Thereafter and prior to the death of the life tenant, the income accrued through July 24, 1955 was $223.73 (schedule H-l of account). The trustee was directed upon the death of the life beneficiary, as to income, “ any part of such income or accumulation as shall not be used, I wish on her demise to pass into and become a part of my residuary estate.”
Precatory language usually will not restrict a gift unless the testamentary intent ascertained from the provisions of the will ordains otherwise. (Matter of Kroog, 116 N. Y. S. 2d 392 [1952]; Phillips v. Phillips, 112 N. Y. 197 [1889].) The primary question in every case is the intention of the testator, and whether in the use of precatory words he meant merely to advise or-influence the discretion of the beneficiary, or himself to con *498 trol and direct the disposition intended. In such a case wé must look at the whole will, so far as it bears upon the inquiry, and the use of the words, “ I wish ” is by no means conclusive. (Phillips v. Phillips, supra, p. 205.)
Here the testator by “ I wish ” provided that on the death of his wife ‘ ‘ any part of such income as shall not be used ’ ’ was to become a part of his residuary estate. The words, while precatory, are read as a command rather than an entreaty. (Matter of Albro, 165 Misc. 486, 490 [1937].) In the creation of this trust the testator had in mind the comfort and support of his wife ‘ ‘ as she shall need the same, so long as she remains my widow ”. This was the primary object which he sought to accomplish. And examination of the subsequent language which limits the use of principal of the trust discloses that the preservation of the principal of the trust for his brother Herbert or for Herbert’s children was strongly in his mind. Giving these words their ordinary significance, the directions are mandatory. This demonstrates that the testator himself meant to control and direct the disposition intended. (Matter of Dillon, 200 Misc. 147 [1951].) The second paragraph of the twelfth provision is inconsistent with the prior provision and shows a similar intent in regard to income.
An absolute gift should not be cut down by subsequent language unless the intent to do so is unmistakably indicated. (Tillman v. Ogren, 227 N. Y. 495, 505 [1920].)
The testator bequeathed the income to his wife, but on her demise he also bequeathed “ any part of such income as shall not be used ”, to his brother, Herbert or to Herbert’s children. ‘‘ Any part ’’ as thus used, are words of limitation, and show that the testator intended that the previous gift, which was apparently absolute, should not remain absolute, but should be limited by that which followed. It indicates a proviso, condition or qualification, and reduces the previous gift by carving-out, not an absolute, but a possible bequest of income to Herbert or Herbert’s children. But this bequest to Herbert or his children was in turn limited by the words “ shall not be used ” which show that the testator did not intend that necessarily there would be anything left on the death of his wife. The gift over is of what may be left. Otherwise the words “ shall not be used” must be rejected as having no meaning whatever. Whether Herbert or Herbert’s children took anything- under the bequest over of “any part of such income” depended upon a contingency, not indeed expressed, but plainly implied from the words “ shall not be used ”. An expectant estate may be defeated by any means which the party creating the estate *499 ‘ ‘ shall in the creation thereof have provided for or authorized ’ ’ and such estate cannot be adjudged void in its creation because it is thus liable to be defeated (Beal Property Law, § 57). This construction gives adequate force to every word used by the testator and avoids the defeat of any part of his intention (Leggett v. Firth, 132 N. Y. 7, 11, 12 [1892]).
“ It is not uncommonly provided in a will or other trust instrument that the income shall be paid to a beneficiary and that on his death the principal and ‘ accrued ’ or ‘ accumulated ’ income shall be paid to others. Under such a provision it is held that at least income which has been actually received by the trustee but which he has not paid to the life beneficiary is payable to his estate and not to the beneficiaries in remainder. If it were held otherwise, the trustee by merely withholding income received by him, either intentionally or by mistake, would be enabled to deprive the life beneficiary of the income and to add it to principal. This would ordinarily be contrary to the testator’s intention.” (3 Scott on Trusts [2d ed.], § 235A, p. 1801; Matter of Keogh, 112 App. Div. 414 [1906], affd. 186 N. Y. 544, motion for reargument denied 186 N. Y. 610 [principal and any income remaining in trustee’s hands]; Matter of Dexter, 134 Misc. 195 [1928] [principal and any accrued income which had not been paid over to the life beneficiary].) In the opinion in Matter of Walbridge (192 Misc. 746 [1948], [principal and any undistributed income to the remaindermen]) it is stated (p. 748): “ the words ‘ and any undistributed income ’ expresses the testatrix’ desire that there be no apportionment under section 204 of the Surrogate’s Court Act” and applied to “ income which became due and was actually received by the trustee after the death of the life tenant
A provision in a will against apportionment under section 204 of the Surrogate’s Court Act is not a direction for an unlawful accumulation (Matter of Juilliard, 238 N. Y. 499 [1924]). It follows, the provision in the will, ‘ ‘ any part of such income as shall not be used ”, is not a direction to accumulate income and does not result in circumvention of such basic principle. (Personal Property Law, § 16.)
There is very little disagreement on the question of apportionment of the $223.73 income accrued at the time of the death of the life tenant but not then in the hands of the trustee. ‘ ‘ Section 204 of the Surrogate’s Court Act provides, among other things, that all annuities, dividends and other payments of every description made payable on becoming due at fixed periods under a will taking effect after June 7, 1875, shall be apportioned between the éstate of the deceased life tenant and the remain *500 derman, but that ‘ This section shall not apply to any case in which it shall be expressly stipulated that no apportionment be made ’ (Matter of Krauthoff, 265 N. Y. 477 [1934].) The language employed by the testator serves clearly to fix the date when payment of income to the life beneficiary shall cease and payment to the remainderman shall begin. It was only, during her life, that the beneficiary was to receive the net income from the trust fund created in her favor. Upon her demise, the principal of that fund, and any part of such income as shall not be used, was directed to be paid to certain remaindermen. ‘ ‘ The language thus chosen is clear and unequivocal and leaves * * * no doubt as to the decedent’s testamentary intent. It constitutes an express stipulation against apportionment within the statutory exception to be found in section 204 of the Surrogate ’s Court Act.” (Matter of McManus, 282 N. Y. 420, 424.) To hold otherwise one must virtually disregard those words and in effect excise them from the will. Accordingly the direction to pay the same to the remaindermen is valid and the $223.73 income accrued at the time of the death of the life tenant and such other income which became due and was actually received by the trustee after the death of the life tenant is to be distributed to the remaindermen entitled to the principal of the trust. (Matter of Juilliard, 238 N. Y. 499, 508, supra [1924]; Matter of McManus, 282 N. Y. 420, 424, supra [1940]; Matter of Walbridge, 192 Misc. 746, supra: Matter of Glorney, 109 N. Y. S. 2d 898, 912.)
A testator may expressly provide that any income in the hands of the trustee on the death of the life beneficiary shall be added to principal. (3 Scott on Trusts [2d ed.], § 235A, p. 1801; Davison v. Tams, 30 Misc. 156 [1899].) The $5,109.66 from the General Electric stock dividend and the $2,794.18 from the Standard Oil of Indiana stock, apportioned to income raises this question. These sums represent stock actually in the hands of the trustee at the time of the death of the life beneficiary, at a date when trustee was not obligated to pay it as income. (Matter of Juilliard, supra, p. 512.) If the testator had intended that the income be accumulated for any period whatever, the will would be invalid to that extent as in violation of our statute against accumulations (Personal Property Law, § 16). (Matter of Dexter, 134 Misc. 195, supra.) The rule is well settled that where direction for an accumulation is void and there is some other and legal disposition, the statute does not apply, and in such case, the direction for accumulation should be eliminated from the will. (Matter of Watson, 144 Misc. 213 [1932].) The words “ If my wife shall not need or take the *501 whole of said annual income, I trust she will let the part not taken remain in my Trustee’s hands as an accumulation ”, indicate the testator thought his wife would not need all the income, and intended that his wife arid not the trustee would accumulate any income, and intended that if the life tenant returned any income to the trustee or did not take all income she would intend it to be added to principal. (Davison v. Tams, supra.) In Equitable Trust Co. v. Prentice (supra) it was held that a testamentary authorization to a trustee to allocate stock dividends to principal was not a provision for unlawful accumulation of income.
In Matter of McManus (supra [principal with any accrued income]) the trust estate included unproductive property which was not sold until after the death of the life beneficiary, such unproductive property having been taken over in satisfaction of a mortgage. In that case the court said that the ultimate salvage represents an interest bearing investment and represents or reflects both capital and accrued income, of which there should be an apportionment. “ ‘ It would be unfair to the estate of the life beneficiary who has been deprived of income with respect to the unproductive property to deprive him or his estate permanently of such income because of the accidental circumstance that the trustee failed to sell the property prior to the death of the beneficiary. ’ ” (P. 427.) This case is distinguishable from the McManus case, in that instead of unproductive property and loss of income the ordinary dividends from this stock were substantially increased to the benefit of the life beneficiary.
I am convinced the testator meant to limit the gift to his wife to what was paid to her during her lifetime. He did not intend to create an estate for his wife which would survive her and pass by will or descent. The testator in providing for payment of income to his wife used the words, “ for her comfort and support ”, which are words of limitation for her lifetime. In Matter of Christensen (140 Misc. 291 [1931]) there was an expressed direction in the will to the effect that “in no case shall anything be payable, after the death of any individual beneficiary of any of separate trusts * * * to the executors or administrators, or otherwise to the estate, of such deceased beneficiary ”. It seems clear this is the intention in the instant case. The direction to pay to the remaindermen, “ any part of such income as shall not be used ’ ’, is not restricted by the words “ accrued ” or “ accumulated ”. The phrases “ accrued income ” and “ accumulated income ” have a distinct and separate meaning. The words “ accrued income ” as they are commonly used, mean income for the current period which was *502 earned upon investments, but which was not yet payable to the trustees at the time of the termination of the trust (Matter of Juilliard, supra, p. 505). The phrase “ accumulated income ” means something that is ‘1 piled up ”, “ amassed ’ ’, the adding of the interest or income of a fund to the principal, pursuant to the provisions of a will, preventing its being expended. (Matter of Watson, 144 Misc. 213, supra.) The ordinary rule is that the life tenant of a residuary trust, such as created here, is entitled to receive income from the date of death of the testator, whether this income after that date be large or small, and whether the trustee receives it by way of ordinary or extraordinary dividends. (Matter of Bird, 241 N. Y. 184, 188 [1925]; Matter of Strong, 203 Misc. 1060 [1952].) The language used in this will indicates the testator intended a departure, from this rule, by providing, any part of the income received by the trustee from the date of the testator’s death to the date of death of the life tenant and not paid to the life tenant during her lifetime, should be paid over to the remaindermen instead of to the estate of the life beneficiary.
“ Ever since the decision in the Osborne case (supra) our courts have recognized the difficulties of application of the principle therein adopted, and have figuratively sighed with relief at the realization that trusts created since the statute of 1926 are not governed by said decision * * * From * * * the progress of the law with respect to stock dividends it is evident that the attitude of our Legislature, of our courts and of the American Law Institute neither calls for nor permits an extension of the principle of the Osborne case (supra) ” (Matter of Strong, 198 Misc. 7, 16, supra). Also, “ The argument may be made that the declaration and payment of a stock dividend is not a distribution of earnings or-other property of the corporation, and is little more than a bookkeeping device. The argument is that the shareholders still retain what they had before, no more and no less, namely a certain proportionate interest in the corporate property. This argument was accepted by a majority of the Supreme Court of the United States in a case where the question was not as to the relative rights of a life beneficiary and remainderman under a trust, but whether a shareholder was subject to the federal income tax. In both situations the question is whether a stock dividend is to be treated as income; but it is possible to hold that it is income as between life beneficiary and remainderman but not income as between the shareholder and the government” (3 Scott on Trusts [2d ed.], § 236.3, pp. 1818-1819).
*503 The words “ any part of such income as. shall not be used ” found in the provision directing the distribution of the remainder upon the death of Frances M. Sanford, are an expression which might refer to either the death of the life beneficiary or the distribution of the remainder. When found in a clause providing for such distribution it appears that these words may be given an effect which would invalidate the plain disposition of income during the term of the trust provided in another part of the will. (Leggett v. Firth, 132 N. Y. 7, supra; Matter of Bennett, 251 App. Div. 684 [1937], affd. 275 N. Y. 593.) If intent is to be found in the words used in a will and these are clear and definite there is no power to change them. (Matter of Bisconti, 306 N. Y. 442, 445 [1954].)
I hold therefore that the $7,903.84 apportioned to income from the General Electric and Standard Oil (Indiana) stock dividends, after the death of the life tenant, is income which has not been used and under twelfth provision of the will must be paid to the remaindermen. Submit decree accordingly.